IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SKEDCO, INC., an Oregon corporation,

                Plaintiff,                    No. 3:13-cv-00968-HZ

     v.

STRATEGIC OPERATIONS, INC., a              OPINION & ORDER
California corporation,

                Defendant.

Brian Park
Steven T. Lovett
Kassim M. Ferris
STOEL RIVES LLP
900 S.W. Fifth Avenue, Suite 2600
Portland, Oregon 97204

       Attorneys for Plaintiff

Gary L. Eastman
EASTMAN & McCARTNEY LLP
401 W. A Street, Suite 1795
San Diego, California 92101

/ / /

1 - OPINION & ORDER

Michael E. Haglund
HAGLUND KELLEY LLP
200 S.W. Market Street, Suite 1777
Portland, Oregon 97201

    Attorneys for Defendant

HERNANDEZ, District Judge:

    Plaintiff Skedco, Inc. brought this patent infringement action against Defendant Strategic

Operations, Inc., alleging that Defendant infringed three claims of United States Patent No.

8,342,652 ("the '852 Patent")[1].  In a December 8, 2015 Opinion, I denied Plaintiff's motion for

summary judgment and granted Defendant's motion for summary judgment on the issues of

literal infringement and infringement under the doctrine of equivalents.  I denied the motions as

moot as to all other issues.  Judgment in favor of Defendant was filed that same day, December

8, 2015.

    Defendant now seeks an award of attorney's fees, sanctions, and costs.  For the reasons

explained below, I deny the motion for fees and for sanctions.  I award costs in the amount of

$20,165.01.

STANDARDS

I.  Attorney Fees - 35 U.S.C. § 285

    Courts have discretion to award attorney's fees to the prevailing party in "exceptional

cases."  35 U.S.C. § 285.  In a 2014 case, the Supreme Court abrogated the Federal Circuit's

analysis for determining "exceptional cases," finding that analysis "unduly rigid" and

---

[1]  The United States, through the Secretary of the Army, owns the '852 Patent.  Plaintiff is the sole and exclusive licensee of the '852 Patent under an agreement which gives Plaintiff the right to bring patent infringement actions in its own name.

2 - OPINION & ORDER

"impermissibly encumber[ing] the statutory grant of discretion to district courts." Octane

Fitness, LLC v ICON Health & Fitness, Inc., 134 S. Ct. 1749, 1755 (2014) (discussing Brooks

Furniture Mfg., Inc. v. Dutailier Int'l, Inc., 393 F.3d 1378 (Fed. Cir. 2005)).  Under Brooks, a

case was "exceptional" for section 285 purposes only if (1) there had been "material

inappropriate conduct related to the matter in litigation" or if (2) the litigation had been brought

in subjective bad faith and the litigation was objectively baseless.  Brooks, 393 F.34d at 1381.

As to "material inappropriate conduct," the Brooks court explained that such conduct must be

"related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in

procuring the patent," or "misconduct during litigation, vexatious or unjustified litigation,

conduct that violates Fed. R. Civ. P. 11, or like infractions." Id.  Subsequent Federal Circuit

decisions further clarified the standards for objectively baseless and subjective bad faith.  Octane

Fitness, 134 S. Ct. at 1754 (citing cases).

    Octane Fitness noted that before Congress enacted 35 U.S.C. § 70, the "American Rule"

governed patent fee awards so that each party paid his or her own attorney's fees, "win or lose."

Id. at 1753 (internal quotation marks omitted).  Then, in 1946, Congress allowed a discretionary

fee-shifting provision, authorizing a court, in its discretion, to award fees to the prevailing party

in a patent case.  Id. (discussing former 35 U.S.C. § 70).  Courts awarding fees under that statute

held that fees were appropriate only in "extraordinary circumstances," and explained that the

statute "enabled them to address unfairness or bad faith in the conduct of the losing party, or

some other equitable consideration of similar force which made a case so unusual as to warrant

fee-shifting." Id. (internal quotation marks omitted).

    The Octane Fitness Court explained that when Congress amended the fee-shifting

provision and recodified it as section 285, the "addition of the phrase 'exceptional cases' to § 285 was for purposes of clarification only." Id. at 1753 (internal quotation marks omitted). The recodification did not substantively alter the meaning of the statute. Id. As such, courts continued to apply the fee provision "in a discretionary manner, assessing various factors to determine whether a given case was sufficiently 'exceptional' to warrant a fee award." Id. This was true even after the creation of the Federal Circuit which was vested with exclusive appellate jurisdiction in patent cases. Id. at 1754.

But, in 2005, the Federal Circuit decided Brooks, which not only limited the circumstances under which an award of section 285 fees was appropriate, but also required the facts supporting the "exceptional case" determination to be established by clear and convincing evidence. Id. (citing Brooks, 393 F.3d at 1382). In Octane Fitness, the Court overruled Brooks's limitations as encroaching on the discretion the statute afforded to the courts. The Court explained that because the statute does not define "exceptional," it is to be construed "in accordance with its ordinary meaning." Id. at 1756 (internal quotation marks and brackets omitted). Given that the ordinary meaning of the word means "uncommon," "rare," or "not ordinary," the Court held that an "exceptional case" is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." Id. District courts may determine that a case is "exceptional" for purposes of section 285 "in the case-by-case exercise of their discretion, considering the totality of the circumstances." Id.

In discussing the "overly rigid" "formulation" adopted in Brooks, the Octane Fitness Court described the first category of cases in which the Brooks court allowed fees, meaning those

involving litigation or certain other misconduct, as applying to independently sanctionable

conduct.  Id.  But, the Court held that "exceptional" cases are not limited to otherwise

sanctionable conduct alone and the district court "may award fees in the rare case in which a

party's unreasonable conduct - while not necessarily independently sanctionable - is nonetheless

so 'exceptional' as to justify an award of fees."  Id. at 1756-57.  As to the second category in

Brooks, the Court concluded that requiring both subjective bad faith and objectively baseless

litigation was not required to distinguish an "exceptional" patent case from a typical patent case.

Id. at 1757.  Instead, a case with either one alone could "sufficiently set itself apart from mine-

run cases to warrant a fee award."  Id.  Additionally, the Court explained that the limitations in

Brooks would render section 285 "largely superfluous."  Id. at 1758.  Because courts already

retain the inherent power to award fees in consequence for a "willful disobedience of a court

order" or when the losing party has acted in "bad faith, vexatiously, wantonly, or for oppressive

reasons," narrowly construing section 285 as only allowing fees in such instances would serve no

purpose.  Id.  Finally, the Court rejected the requirement that the "exceptional" determination be

founded on clear and convincing evidence.  Id.

## II.  Sanctions

Defendant seeks sanctions under both 28 U.S.C. § 1927 and this Court's inherent

authority.

### A.  28 U.S.C. § 1927

An attorney admitted to practice in a federal court "who so multiplies the proceedings in

any case unreasonably and vexatiously may be required by the court to satisfy personally the

excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  28

U.S.C. § 1927. "Sanctions pursuant to section 1927 must be supported by a finding of subjective bad faith." Blixseth v. Yellowstone Mountain Club, LLC, 796 F.3d 1004, 1007 (9th Cir. 2015) (internal quotation marks omitted), petition for cert filed sub nom., Flynn v. Yellowstone Mountain Club, LLC, 84 U.S.L.W. 3387 (U.S. Dec. 28, 2015) (No. 15-869). "[B]ad faith is present when an attorney knowingly or recklessly raises a frivolous argument or argues a meritorious claim for the purpose of harassing an opponent." Id. (internal quotation marks omitted).

While a finding of subjective bad faith clearly supports a sanctions award under section 1927, Ninth Circuit cases suggest that a finding of recklessness may suffice. In a 2010 case, the court explained that in section 1927,

> [t]he key term in the statute is "vexatiously"; carelessly, negligently, or unreasonably multiplying the proceedings is not enough. While, "[o]ur cases have been less than a model of clarity regarding whether a finding of mere recklessness alone may suffice to impose [a] sanction for attorneys' fees" under § 1927, [B.K.B. v. Maui Police Dep't, 276 F.3d 1091, 1107 (9th Cir. 2002)], or whether there must be a finding of subjective bad faith, see Moore v. Keegan Mgmt. Co. (In re Keegan Mgmt. Co. Sec. Litig.), 78 F.3d 431, 436 (9th Cir.1996), what is clear from our case law is that a finding that the attorney recklessly or intentionally misled the court is sufficient to impose sanctions under § 1927, see Malhiot v. S. Calif. Retail Clerks Union, 735 F.2d 1133, 1138 (9th Cir.1984), and a finding that the attorneys recklessly raised a frivolous argument which resulted in the multiplication of the proceedings is also sufficient to impose sanctions under § 1927, see, e.g., B.K.B., 276 F.3d at 1107 ("[R]ecklessness plus knowledge was sufficient to justify the imposition of § 1927 sanctions.")[.]

Girardi v. Dow Chem. Co. (In re Girardi), 611 F.3d 1027, 1061 (9th Cir. 2010).

B. Court's Inherent Authority

"'It has long been understood that certain implied powers must necessarily result to our Courts of justice from the nature of their institution, power which cannot be dispensed with in a

Court, because they are necessary to the exercise of all others.'" Haeger v. Goodyear Tire & Rubber Co., No. 12-17718, 2016 WL 625099, at *7 (9th Cir. Feb. 16, 2016) (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991)) (brackets omitted). "This inherent power is not limited by overlapping statutes or rules. " Id.

"Before awarding sanctions pursuant to its inherent power, the court must make an express finding that the sanctioned party's behavior 'constituted or was tantamount to bad faith.'" Id. at *8 (internal quotation marks omitted); see also Chao v. Westside Drywall, Inc., 709 F. Supp. 2d 1037, 1080 (D. Or. 2010), as amended (May 13, 2010) ("The inherent power 'extends to a full range of litigation abuses,' however, the litigant must have 'engaged in bad faith or willful disobedience of a court's order.'") (quoting Fink v. Gomez, 239 F.3d 989, 992 (9th Cir. 2001)).

DISCUSSION

I.  35 U.S.C. § 285

Defendant argues that this case is "exceptional" under section 285, and thus, it is entitled to $709,905[2] in attorney's fees and an additional $27,744.57 in non-taxable costs, because Plaintiff brought the case in bad faith, Plaintiff failed to adequately investigate its claims before filing suit, Plaintiff's claims were objectively unreasonable, and Plaintiff knowingly withheld material prior art from the Patent and Trademark Office (PTO) during prosecution of the '852 Patent.

A.  Motive & Pre-Filing Investigation

According to Defendant, Plaintiff knew of Defendant since October 2007 and knew of Defendant's allegedly infringing Blood Pumping System (BPS) since at least January 2011.  On

---

[2]  This figure is exclusive of fees incurred in preparing the fee motion.

September 20, 2012, Plaintiff's General Manager Bud Calkin wrote an email to Paul Mele and Sara Baragona, both of whom appear to be with the U.S. Army, complaining of "another infringement" of Plaintiff's system, this time by Defendant.  Eastman Sept. 4, 2015 Decl. Ex. 5 at 3-4; ECF 125-5.  Calkin wrote that Plaintiff had "responded to a solicitation" and a "company called Strategic Operations won it with their own system."  Id. Calkin referred to a prior conversation with a representative of Defendant's "over a year and a half ago" at "SOMA."[3]  Id. He noted that when he talked to the representative about providing a bleeding system for Defendant's product, the representative was "hostile."  Id.  As of the date of the email, Calkin had looked at Defendant's website and found that Defendant "deliver[ed] simulated blood as fast as we do but they don't show the delivery system."  Id.  He commented that "[n]ow we are losing orders to them."  Id.  He closed by stating that he was "getting very tired of people stealing our technology and taking our orders[,]" and then asking "what do you think we should do?"  Id.

Defendant also points to a March 12, 2013 email from Plaintiff's Medical Products Specialist Lynn King, the inventor of the system disclosed in the '852 Patent, noting a contract that appears to have been awarded to Defendant by "PEO STRI" for NATO special forces training in Belgium which replaced a contract previously held by Plaintiff.  Eastman Dec. 22, 2015 Decl. Exs. 1, 2, 6.

Based on these documents, Defendant argues that the evidence shows that Plaintiff filed the lawsuit because it was angry that the government had selected Defendant's product to replace Plaintiff's product, and it was angry that Plaintiff's sales were waning.  It contends that Plaintiff knew that its product could not compete with Defendant's product, so it took the "easy way out"

---

[3]  SOMA stands for the Special Operations Medical Association.  Calkin Decl. ¶ 4.

8 - OPINION & ORDER

and sued Defendant. Additionally, Defendant argues Plaintiff's desire to coerce Defendant into paying Plaintiff for sales of Defendant's system is confirmed by the fact that on the day Plaintiff filed suit, June 10, 2013, Plaintiff's counsel contacted Defendant's counsel trying to negotiate a license or royalty fee in exchange for dismissing the suit. Eastman Dec. 22, 2015 Decl. Ex. 3.

The record shows that the parties had been communicating with each other since at least 2007. Calkin Decl. ¶ 3 & Ex. 1. In October 2007, in response to an email from King, Stu Segall, Defendant's President, said that he would "welcome the opportunity to utilize your [system] in our Medical Training package." Calkin Decl. Ex. 1 at 1-2. It appears that arrangements were made for King to visit Defendant's facility in San Diego. Id. at 1. It is unclear if that visit occurred or if the parties continued discussions of any kind at that time. Communications resumed again in December 2010, when Defendant's Executive Vice-President Kit Lavell emailed Calkin to state that it was "good talking to you." Id. at 4. According to Calkin, Plaintiff was interested in providing its system for use in the "Cut Suit" product Defendant was developing. Calkin Decl. ¶ 2 & Ex. 1 at 3 (Jan. 5, 2011 email from King to Lavell noting that he was impressed with Defendant's new Cut Suit and expressing the possibility of using Plaintiff's system in conjunction with the Cut Suit's operation; indicating that Plaintiff's product's most current instruction manual was enclosed). Calkin states that despite the communications, the parties never reached an agreement on any business collaboration.

Lavell saw Plaintiff's product at the December 2010 SOMA trade show. Lovett Sept. 4, 2015 Decl. Ex. 11; ECF 129 (Lavell Dep. 80). Defendant first sold its product in late 2011 or 2012. Id. (Lavell Dep. 76). Thus, at least one and one-half years before filing suit, and before Defendant first sold its product, Plaintiff had shared information about its product with

Defendant, including providing Defendant with the instruction manual for the product, and had attempted to collaborate in some way as to both companies' products.

In September 2012, Calkin emailed Lavell requesting information about Defendant's BPS to determine if it was in conflict with the system Plaintiff had licensed from the U.S. Army. Calkin Decl. ¶ 6.  Calkin and Lavell spoke on the phone about Plaintiff's concerns with Defendant's BPS product.  Id.  Calkin asked for Defendant's patent attorney's contact information so they could discuss the matter and determine if there was a conflict.  Id. Ex. 4.  In the email Calkin said:  "We do have a patented system and we want to be assured that our patent isn't infringed."  Id.  Calkin expressed his desire to resolve any issues amicably.  Id.

During late 2012 or early 2013, Calkin studied Defendant's videos, website descriptions, and brochure descriptions of the BPS, as well as catalogs and articles about the BPS.  Calkin Decl. ¶ 5.  Calkin concluded that the BPS had a collapsible reservoir, a pump connected to the reservoir, several valves, conduit lines connecting the reservoir, the pump, and the valves for fluid to flow between them, an electronic controller, a key fob remote controller, wound sites, and a backpack container containing these components.  Id.  According to Calkin, Defendant's website and brochure described the BPS as follows:  "The BPS is self-contained and allows for 4 simultaneous bleeds controlled by a wireless fob with a 50-foot standoff and 3 liters of blood. Each line can be controlled by the operator to simulate both venous and arterial bleeds."  Id. & Ex. 3 (Jan. 2013 printout of Defendant's website re: BPS product).

Calkin recalls discussing this description with King in late December 2012.  Id.  He understood the second sentence (regarding control of each line by the operator to simulate two types of bleeds), to mean that the "four bleeds in the BPS system operate at the same time and

have independent control to both flow at a constant rate (in the case of venous flow) and pulsate (in the case of arterial flow). Id. Calkin and King "concluded from [Defendant's] description that the BPS uses a pump and independently controlled valves to simulate the pulsing of arterial bleeding and/or the continuous flow of venous bleeding separately on individual output lines." Id.

Calkin observed BPS "up close" at the December 2012 SOMA trade show. Calkin Decl. ¶ 4. At that time, Calkin looked at the product and picked up a brochure. Calkin Decl. Ex. 2 at 36. Calkin also spoke to Defendant's representative who explained the key functions and components of the BPS, including the bladder and the pump. Calkin Decl. ¶ 4.

During late 2012 and into the spring of 2013, Calkin and King attempted to locate a BPS they could deconstruct and inspect. Calkin Decl. ¶ 7. In February 2013, Defendant tried to purchase one through a company called ADS. Id. & Ex. 5 (emails between Plaintiff and ADS and attachments of price quote and purchase order). ADS cancelled the order before shipment. Id. When Calkin asked ADS about the cancellation, ADS explained that it had ordered the product from Defendant as a "drop-shipment" to be shipped directly from Defendant to Plaintiff and that Defendant, upon learning that the order was to be shipped to Plaintiff, declined the order and refused to sell it to Plaintiff as long as there was any threat of potential litigation between the two companies. Id.

Next, Plaintiff, through King and Calkin, attempted to obtain a BPS through a contact with the Mammoth, California Fire Department who was willing to help Plaintiff purchase the product. Id. ¶ 8. When that person attempted to purchase the product, Defendant questioned why he was buying only one. Id. At that point, because of Defendant's previous position that it

11 - OPINION & ORDER

would not sell a BPS to Plaintiff, Plaintiff dropped this second attempt to purchase the product.
Id.

On May 16, 2013, still before the lawsuit was filed, Calkin emailed Lavell as a follow-up to a phone conversation that day.  Calkin Decl. ¶ 9 & Ex. 6 (copy of email exchange).  Calkin states he was attempting to "spur action on reaching a pre-litigation resolution without litigation via a license."  Id.  Calkin told Lavell that he "would like to handle [this matter] in a gentlemanly manner if possible."  Id. Ex. 6.  Even after the Complaint was filed, Calkin and Lavell emailed, in early July 2013, indicating they were continuing to discuss non-litigation resolution of the matter.  Calkin Decl. Ex. 7.

Counsel for both parties began communicating in the fall of 2012.  Ferris Decl. ¶ 4 & Ex. A (copies of email correspondence October-December 2012, referring to September 26, 2012 phone call between counsel).  Kassim Ferris, one of Plaintiff's attorney's, spoke with Gary Eastman, Defendant's attorney, on September 26, 2012 to discuss Plaintiff's infringement concerns.  Ferris Decl. ¶ 4.  During the call, Ferris requested details of the BPS.  Id.  He gave Eastman relevant patent and patent application numbers (the '852 Patent issued January 1, 2013, so it had not been issued yet).  Id.  He repeatedly followed up with Eastman by email, continuing through December 2012.  Id. & Ex. A.  Eastman failed to reply in any substantive manner.  Id.

Finally, on Sunday, January 6, 2013, Eastman emailed Ferris indicating he had received the claims, Defendant's products, Plaintiff's products, and asked to schedule a phone call.  Ferris Decl. ¶ 6 & Ex. C at 1.  The next morning, Ferris responded that he was available that day.  Ferris. Decl., Ex. C at 6.  Because Eastman never responded, Ferris sent another email that evening, setting out times during the week when he was available to talk.  Id. at 11.  Eastman

responded that he had gone home sick, but would check back in the morning.  Id. at 17.  Eastman did not communicate with Ferris again until March 14, 2013, when he apologized for "dropp[ing] the ball" and asked to set up a phone call.  Id. at 23.  Counsel finally spoke by phone on March 19, 2013.  Ferris Decl. ¶ 6.

On January 7, 2013, when Ferris was still trying to talk to Eastman, Ferris forwarded a summary of Plaintiff's then-current basis for believing that Defendant was violating the '852 Patent, to the U.S. Army.  Ferris Decl. ¶ 5 & Ex. B; Eastman Reply Decl. Ex. 11.  The Army gave its consent to seek a negotiated solution or to pursue infringement litigation if Plaintiff believed it appropriate.  Ferris Decl. ¶ 5 & Ex. B.

Ferris states that during the March 19, 2013 call with Eastman, Eastman "acknowledged that claim 18 of the patent-in-suit appeared to cover the BPS and was not easy for [Defendant] to design around in a manner that would not infringe the '852 patent."  Id. ¶ 7.  Eastman asked if a license were available and indicated Defendant was considering a license.  Id.  On May 7, 2013, Ferris called Eastman to tell him that Plaintiff was willing to consider licensing the Trauma Training System patents, including the '852 Patent and another related parent patent, U.S. Patent No. 7,887,330 ("the '330 Patent").  Id. ¶¶ 3, 8.  Ferris told Eastman that Plaintiff's willingness to enter into license negotiations was subject to first receiving historical sales data for Defendant's BPS.  Id. ¶ 8 & Ex. D at 1.  Eastman did not respond until May 29, 2012.  Id. & Ex. D at 2.  Eastman asked if Ferris could schedule a phone call for May 31, 2013.  Ferris Decl. Ex. D at 2.  Although Ferris indicated he was able to do that, he also told Eastman he needed sales data before Plaintiff was in a position to consider "deal terms."  Id. at 4.  The record does not show a response by Eastman to that email.

13 - OPINION & ORDER

Ferris, who is a mechanical engineer, states that before this lawsuit was filed, he analyzed the '852 Patent, interpreted its claims and claim terms, and studied the prosecution history of the patent and the prior art it cited.  Ferris Decl. ¶ 3.  He did the same analysis of the '330 Patent.  Id. Additionally, he studied photographs and product brochures of the BPS which described the system and its operation.  Id. ¶¶ 2, 4.  For example, in May 2013, he evaluated photographs and brochures that were posted on Defendant's website.  Id. ¶ 9.  These confirmed that the BPS had a collapsible reservoir "of the kind utilized in a Camelbak brand personal hydration system," a pump mechanism in fluid communication with that reservoir, and a controller controlling the pump.  Id.  The materials indicated that "each line can be controlled by the operator to simulate both venous and arterial bleeds[.]"  Id. & Exs. E, F (copies of the photographs and brochure). Ferris understood this to mean that "each line was equipped with a valve connected to a controller."  Id.  On June 6, 2013, Ferris reviewed a product brochure for Defendant's "Cut Suit" product which was posted on Defendant's website.  Id. ¶ 10.  This brochure indicated that the Cut Suit required a BPS for the Cut Suit's simulated bleeding functionality.  Id. & Ex. G (copy of brochure).

Based on his investigations and discussions, Ferris believed that the BPS included a collapsible reservoir of the Camelbak type, a pump connected to the reservoir, a plurality of valves, conduits between the reservoir and the pump and between the pump and the valves for fluid communication between them, an electronic controller connected to the pump and at least one valve, a remote activation controller (fob), a plurality of detachable wound sites in fluid communication withe the valves, and a backpack container housing the reservoir, the pump, and at least one valve.  Ferris Decl. ¶ 12.  After interpreting the patent claims and comparing them to

the information available regarding the BPS, Ferris concluded that the elements of Claims 18-20

of the '852 Patent "matched up with the structure and operation of the BPS[.]"  Id. ¶ 12.  Ferris

states that the parties continued to discuss the possibility of a license after the lawsuit was filed.

Id. ¶ 14.

      Based on my review of the entire record and my knowledge of the case, I reject

Defendant's arguments that Plaintiff brought this lawsuit in bad faith and that its pre-filing

investigation was inadequate or unreasonable.  I agree with Defendant that Calkin's September

20, 2012 email expresses frustration over lost sales to Defendant and losing out to Defendant on

a "solicitation."  But, at the end of that email Calkin asks "what do you think we should do?"

This statement undermines the assertion that at that time, Calkin formed an immediate, knee-jerk

response of marching to the federal courthouse with a patent suit in hand.  Additionally, in the

email, Calkin refers to what he believes to be infringement by Defendant.  Regardless of whether

he was right or wrong, his belief at that time also belies that the lawsuit was motivated solely by

anger over lost sales and not by a legitimate concern over patent rights protection.  And, by this

time, Calkin had already shared the instruction manual for Plaintiff's product with Defendant,

allowing Calkin to infer that Defendant, with knowledge of Plaintiff's product, was providing the

market with a substantially similar product.  Moreover, Calkin and patent counsel both continued

to reach out to Defendant or Defendant's counsel to obtain information and negotiate a solution

short of litigation.  Simply because Calkin was frustrated with lost sales does not by itself

establish a bad faith motive for bringing suit.  At best, the record suggests that the lost

solicitation and sales catalyzed Calkin into researching Defendant's product and assessing

whether it infringed the claims that soon issued as the '852 Patent.

15 - OPINION & ORDER

Defendant's argument that Plaintiff's bad faith motive is supported by the letter Plaintiff sent to Defendant on the day it filed suit offering to dismiss the suit if the parties could negotiate a license or royalty fee, is disingenuous in the face of the parties' communication history. Defendant takes the June 10, 2013 letter out of context and implies that Plaintiff's license-for-dismissal offer came out of the blue.  In fact, the record shows that the parties had been discussing a possible license agreement for the previous couple of months, and continued to discuss it after the case was filed.  Moreover, it is not uncommon in any civil litigation for the party initiating the lawsuit to offer, simultaneous with filing, to negotiate a speedy resolution resulting in dismissal.  Notably, Ferris's statement that Defendant's counsel himself expressed concern over his client's possible infringement of Claim 18 of the '852 Patent in March 2013 is unrebutted.  Thus, Plaintiff reasonably believed at the time it filed suit that Defendant's own assessment was one of possible exposure.  With that, it was not unreasonable to continue to offer a license or royalty arrangement in lieu of continued litigation.  Neither the fact that Calkin was angry or frustrated about lost sales nor the June 10, 2013 letter establishes any ill or bad-faith motive in filing suit.

As to the pre-filing investigation, Defendant is correct that neither Calkin nor King appears to have personally examined the internal components of the BPS before the lawsuit was filed.  But, that was not for lack of trying.  Defendant does not dispute that before the lawsuit was filed, it thwarted Plaintiff's effort to obtain its own BPS so Plaintiff could examine it thoroughly. As a result, Plaintiff relied on written descriptions in brochures and on Defendant's website, photographs, Calkin's observation of the product at the SOMA, and his ten-minute discussion of the product with Defendant's representative at the SOMA, to formulate its opinion that it had an

16 - OPINION & ORDER

infringement claim.  Plaintiff's counsel had also discussed the BPS with Defendant's counsel.

Further, Plaintiff knew that Defendant's own counsel agreed that the BPS could be violating

Claim 18 of the '852 Patent.

Defendant argues that Plaintiff could not have reasonably concluded that the BPS valves

are connected to, and controlled by, a controller independent of the pump.  Def.'s Reply at 5-7.

Defendant's argument appears to be premised on hindsight and this Court's December 8, 2015

summary judgment opinion.  That is not the proper lens, however, by which to determine

whether Plaintiff's pre-filing investigation was reasonable.

Defendant does not dispute that Plaintiff reasonably concluded based on its investigation

that the BPS had a collapsible reservoir, a pump connected to the reservoir, several valves,

conduit lines connecting the reservoir, the pump, and the valves for fluid to flow between them, a

remote activation controller, wound sites which were in fluid communication with the valves,

and a backpack container housing these components.  Defendant targets Plaintiff's conclusion

that the BPS had a valve or valves, other than the obvious external adjustable valves, physically

connected to or controlled by, a controller.  Defendant contends it was unreasonable for Plaintiff

to conclude based on a description that the BPS allowed for each line to be controlled by an

operator to simulate both venous and arterial bleeds, that the BPS necessarily relied on a pump

and independently controlled valves to simulate the pulsing of arterial bleeding or the continuous

flow of venous bleeding separately on individual output lines.  Defendant argues that images and

descriptions showing only adjustable valves at the end of each line and a remote fob along with

knowledge that each line can be controlled by the operator, do not address the connection

between the valves and fob or the control of the valves by the fob.  Without more, Defendant

contends, Plaintiff's pre-filing investigation was incomplete.

But, at the time it filed the suit, the concept of "connection" was not yet defined. In fact, as discussed more thoroughly below, some key terms were not defined until the December 8, 2015 Summary Judgment Opinion. My conclusion at the end of the case that the connection between the valve and the controller must be physical, does not mean that Plaintiff's pre-litigation interpretation of the '852 Patent as including a non-physical connection, and Plaintiff's pre-filing determination (in the absence of actual physical inspection), that the BPS relied on a connector to regulate the valves in some fashion, were unreasonable.

"Although Octane ostensibly liberalized the standard for fee shifting, and clearly reduced the prevailing party's burden from clear and convincing to a preponderance of the evidence, post-Octane decisions awarding fees have generally cited egregious behavior." Vasudevan Software, Inc. v. Microstrategy, Inc., No. 11-CV-06637-RS, 2015 WL 4940635, at *5 (N.D. Cal. Aug. 19, 2015) (citing cases from the Northern District of Illinois, Southern District of New York, and the Western District of North Carolina). In light of pre-Octane Fitness Federal Circuit decisions addressing the adequacy of pre-filing investigations, the facts here do not show that Plaintiff's conduct was egregious.

In Q–Pharma, Inc. v. Andrew Jergens Co., 360 F.3d 1295 (Fed. Cir. 2004), the court rejected the defendant's argument that the plaintiff's reliance on advertising alone did not amount to a reasonable effort to determine whether the accused product satisfied the asserted claim limitations. Id. at 1300-03. The Defendant in Q-Pharma argued that an earlier case, View Engineering, Inc. v. Robotic Vision System, Inc., 208 F.3d 981, 985 (Fed. Cir. 2000), stood for the proposition that "reliance on advertising as a basis for filing an infringement suit is not

sufficient under Rule 11." Id. at 1302.  In rejecting this interpretation of View Engineering, the

Q-Pharma court explained that the View Engineering court had affirmed the district court's award

of Rule 11 sanctions "because the patentee's reliance on the accused infringer's advertising

statements alone did not provide an adequate factual basis to support the patentee's infringement

counterclaim." Id. at 1302 (emphasis added).  The court noted that in View Engineering, the

court-imposed sanctions were warranted "because the patentee had not performed any claim

construction analysis or an infringement analysis prior to filing its counterclaim for

infringement." Id. (emphasis added).

       In contrast, the plaintiff in Q-Pharma "did not file suit based solely on [the defendant's]

advertising[.]" Id. (emphasis added).  "[C]ritically, it also relied on its own comparison of the

asserted claims with the accused product." Id.  The court explained that "the key factor in

determining whether a patentee performed a reasonable pre-filing inquiry is the presence of an

infringement analysis . . . [which] . . . can simply consist of a good faith, informed comparison of

the claims of a patent against the accused subject matter[.]" Id.  The Q–Pharma court found the

following pre-filing investigation reasonable:  (1) obtaining a sample of the accused product

without analyzing it; (2) reviewing the defendant's advertising and labeling statements; and (3)

most importantly, comparing the claims of the patent with the accused product.  Id. at 1302–03.

The Q-Pharma court further distinguished an older Federal Circuit case where the plaintiff had

not attempted to obtain a sample of the accused product or compare the accused device with the

patent claims before filing suit.  Id. at 1302 (distinguishing Judin v. United States, 110 F.3d 780

(Fed. Cir. 1997)).

       This case is more like Q-Pharma than the cases Q-Pharma distinguished.  As indicated,

19 - OPINION & ORDER

Plaintiff analyzed BPS videos and website and brochure descriptions.  Calkin observed the BPS at a SOMA trade show and spoke to the representative about the product.  Plaintiff's counsel reviewed photographs and product descriptions.  Plaintiff attempted to order a sample of the BPS but was unable to do so because of Defendant's desire to prevent Plaintiff from obtaining one. Plaintiff's counsel talked to Defendant's counsel about the BPS.  Importantly, Plaintiff's counsel analyzed the '852 Patent, its prosecution history, and prior art.  Plaintiff's counsel interpreted the '852 Patent claims and terms and compared the claims to the BPS to assess infringement.  That Plaintiff ultimately lost the case based on a claim construction involving components that were not visible from the outside of the BPS does not mean that Plaintiff's interpretation of the pre-filing evidence was unreasonable.

B.  Litigation Position

Defendant next argues that the case is "exceptional" for purposes of section 285 because Plaintiff's claims were meritless.  Approximately six months after the lawsuit was filed, Defendant provided an exemplar BPS to Plaintiff.  Eastman Dec. 22, 2015 Decl. ¶ 8 (stating that Defendant produced the BPS in January 2014).   According to Eastman, the pump included in that exemplar BPS was a "fuel pump from a vehicle."  Id. Ex. 5 (Calkin Dep. 61) (stating that the "pump" which is not identified in the deposition at the cited page, was a "fuel pump from a vehicle.").  Calkin was a mechanic for several years and testified that he was "very much" familiar with the design and function of fuel pumps.  Id.[4]

---

[4]  According to Plaintiff, the internal components of the sample BPS Plaintiff received in January 2014 were different from those described in Defendant's document production and from the blood pumping system described in Defendant's own patent application.  After seeking clarification from Defendant, Defendant produced documents in April 2014 providing additional information.  Independently, Plaintiff was able to obtain a used BPS which had a different pump

20 - OPINION & ORDER

Defendant argues that based on an examination of the BPS, in conjunction with the specifications, claim language, and drawings of the '852 Patent, Plaintiff knew or should have known that the BPS could not satisfy every limitation in Claim 18, either literally or under the doctrine of equivalents.  This is true, suggests Defendant, whether one considers the manually adjustable valves or the internal valves of the pumps used in the BPS.  Defendant argues that the plain language of Claim 18 required a pump and a valve connected to a controller while the BPS did not have a valve connected to a controller.

In support of its position, Defendant cites overwhelmingly to this Court's December 8, 2015 Summary Judgment Opinion.  Def.'s Mot. at 14-17.  Although that Opinion ended the case in Defendant's favor, it does not establish that Plaintiff's position in the litigation was objectively baseless.  In fact, the earlier Claim Construction Opinion rejected Defendant's proposed construction of "connected to" as requiring an electrical relationship.  Sept. 3, 2014 Op. at 19; ECF 49.  While the claim required "a physical connection for the fluid to travel between the reservoir and wound site, with connections to the pump and the valve in between . . . there is nothing in Claim 18 to show that the patentee intended to limit 'connected to' to an electrical connection just because the 'in fluid communication with' relationship describes a physical connection."  Id. at 20.  I further noted that "'[c]onnected to' is a broad term."  Id.; see also id. at 20-26 (continuing discussion).  In rejecting an "electrical connection," I implicitly rejected a construction requiring a physical connection.  Additionally, I rejected Plaintiff's proposed

---

configuration than the sample provided by Defendant in discovery.  At this point, claim construction analysis was underway given that the parties were ordered to exchange draft claim constructions by May 6, 2014 and to submit a joint proposed claim construction chart to the Court by May 16, 2014.  ECF 34.

construction of "interacting directly or indirectly with" because it was broad and vague.  Id. at 26.

I did not, at that time, expressly reject that proposal because it included a limitation of an indirect

connection.  Id.

     That the terms were still capable of encompassing an indirect connection is demonstrated

by my questions at the beginning of oral argument on the summary judgment motions.  There, I

asked the parties:

>      And here's a hint.  This is a question to both parties.  If "connected to" is
> understood to allow for an indirect, non-physical connection, does that change
> either party's obviousness argument?
>
>      And then a question for the defendant is:  What happens to the
> infringement argument when "connected to" is understood to allow for indirect
> non-physical connection?

Transcript of Nov. 10, 2015 Mot. Hearing; ECF 151 at 6.  Finally, I note that in the Summary

Judgment Opinion, I implied that my conclusion that the valves had to be physically connected to

and controlled by the controller may represent a change in my earlier claim construction.  Dec. 8,

2015 Op. at 14 n.6.

     The December 8, 2015 Opinion made clear that Plaintiff's infringement contentions

lacked merit.  But, until the claim language was discussed and defined in the Summary Judgment

Opinion, Plaintiff's infringement claims were not baseless.  E.g., SFA Sys., LLC v. Newegg Inc.,

793 F.3d 1344, 1348 (Fed. Cir. 2015) (explaining that in Octane Fitness, the "Supreme Court

made clear that it is the 'substantive strength of the party's litigating position' that is relevant to an

exceptional case determination, not the correctness or eventual success of that position" and that

a "party's position on issues of law ultimately need not be correct for them to not 'stand out' or be

found reasonable") (quoting  Octane Fitness, 134 S.Ct. at 1756) (emphasis added in SFA Sys.);

22 - OPINION & ORDER

see also Raylon, LLC v. Complus Data Innovations, Inc., 700 F.3d 1361, 1368 (Fed. Cir. 2012)

("Reasonable minds can differ as to claim construction positions and losing constructions can

nevertheless be nonfrivolous.").

### C.  PTO Prior Art Withholding

At summary judgment, Defendant argued that the '852 Patent was unenforceable because

of what it considered to be inequitable conduct.  Specifically, Defendant contended that Plaintiff

failed to disclose three material prior art references in the prosecution of the '852 Patent.  Def.'s

Mot. for Partial Summ. J. at 37-43; ECF 101.  In that context, Defendant was required to show,

by clear and convincing evidence, that the "patentee acted with the specific intent to deceive the

PTO."  Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1290 (Fed. Cir. 2011) (en

banc).  In asserting the nondisclosure of information, the accused infringer must establish that the

"applicant *made a deliberate decision* to withhold a *known* material reference."  Id. (internal

quotation marks omitted).  "In other words, the accused infringer must prove by clear and

convincing evidence that the applicant knew of the reference, knew that it was material, and

made a deliberate decision to withhold it."  Id.  The evidence must be such to "*require* a finding

of deceitful intent in light of all the circumstances."  Id. (internal quotation marks omitted).

At the time Therasense was decided, the clear and convincing evidentiary burden for a

determination of inequitable conduct based on nondisclosure of information was the same as the

burden required to establish a case as "exceptional" for section 285 fee purposes.  Then, Octane

Fitness changed the evidentiary burden for the section 285 exceptional case determination to a

preponderance of the evidence.  At summary judgment, as a result of my conclusion that there

was no infringement, I declined to address any invalidity or inequitable conduct arguments.  Dec.

23 - OPINION & ORDER

8, 2015 Op. at 23-24.  Thus, there has been no adjudication of the inequitable conduct issue.

The Federal Circuit does not appear to have addressed the question of the post-<u>Octane Fitness</u> evidentiary burden required to establish that a case is exceptional under section 285 based on an inequitable conduct argument which in the summary judgment context can be proven only by clear and convincing evidence.  In a 2015 case, the Eastern District of Virginia observed that "[p]ost-<u>Octane</u>, courts differ on the burden that applies to proving inequitable conduct." <u>Stretchline Intellectual Props. Ltd. v. H&M Hennes & Mauritz LP</u>, No. 2:10-CV-371, 2015 WL 5175196, at *5-6 (E.D. Va. Sept. 3, 2015), appeal dismissed (Nov. 4, 2015).   The court cited cases from a variety of jurisdictions, some of which applied the clear and convincing standard when inequitable conduct is raised as a defense but the preponderance standard when raised as a basis for a fee award under section 285, and others that applied the clear and convincing standard regardless of the context.  <u>Id.</u> (citing <u>E. Coast Sheet Metal Fabricating Corp. v. Autodesk, Inc.</u>, Civ. No. 12–cv–517–LM, 2015 WL 4603463, at *5 (D.N.H. July 30, 2015); <u>Robbins Co. v. Herrenknecht Tunnelling Sys. USA, Inc.</u>, No. 5:13cv2113, 2015 WL 3454946, at *4 (N.D. Ohio May 29, 2015)).  In the end, the Virginia court adopted the approach espoused by the Eastern District of Texas:

> "Since inequitable conduct is neither a necessary nor a sufficient condition for a finding of exceptionality, the evidence supporting the allegation stands on its own. Thus, the Court will consider that evidence as part of the "totality of the circumstances" inquiry required by <u>Octane</u>, and the totality of the evidence (including both evidence of alleged inequitable conduct and other evidence) will be weighed using the preponderance of the evidence standard.  If the evidence of inequitable conduct is sufficient to satisfy the clear and convincing standard, the proof of inequitable conduct will be entitled to substantial weight in that calculation."

<u>Id.</u> at *6 (quoting <u>DietGoal Innovations LLC v. Chipotle Mexican Grill, Inc.</u>, Civ. A. No.

24 - OPINION & ORDER

2:12–cv–00764–WCB, 2015 WL 1284669, at *5 (E.D.Tex. Mar. 20, 2015)).

The parties here primarily rely on the summary judgment briefing to support and oppose the inequitable conduct argument without discussing whether the <u>Therasense</u> clear and convincing burden of proof applies under <u>Octane Fitness</u> in resolving a section 285 fee motion asserting inequitable conduct of nondisclosure. After reviewing the materials, I decline to analyze the burden of proof issue thoroughly because even assuming that a preponderance of the evidence standard applies, I find no basis for concluding that the alleged inequitable conduct facts make this case exceptional for purposes of section 285.

Defendant relies on timing. On August 13, 2010, the PTO issued a "Final Office Action" regarding the prosecution of Application No. 11/759,891 ("the 891 Application") which was a continuation-in-part of a prior patent application, Application No. 11/729,064 filed on April 23, 2007, which eventually issued as the '330 Patent on February 15, 2011. This Final Office Action rejected several claims of the '891 Application, finding them anticipated under 35 U.S.C. § 102(e) by Bardsley, one of the three prior art references at issue here. Although the two other prior art references at issue, which are the two Niiranen Patents, are not mentioned in the "Detailed Action" portion of the Final Office Action, the patent examiner noted, in the Conclusion section, that the two Niiranen Patents and other prior art all disclose mannequin forms having a pump, reservoir, conduit, controller, and sleeve simulating skin located in a common housing. Eastman Aug. 21, 2015 Decl. Ex. 45; ECF 113-5.

The '852 Patent began with a nonprovisional application on January 19, 2011, Application No. 13/009,665. There appears to be no dispute that during the prosecution of the '665 Application, the three prior art references (Bardsley and the two Niiranen patents) were not

25 - OPINION & ORDER

disclosed to the patent examiner.

Given that the '330 Patent, the '852 Patent, and the '891 Application (which was abandoned in December 2011), are in the same family of patent applications, with King as the inventor, Defendant argues that the timing of the '665 Application coming just a few months after the examiner rejected the '891 Application based on anticipating prior art, eliminates any reasonable explanation to justify withholding of that prior art from the patent examiner and thus, the only possible motive is deceit.

Whether evaluated under a preponderance of the evidence or clear and convincing standard, an intent to deceive is still the relevant touchstone for determining if Plaintiff's failure to cite to the prior art is wrongful deception.  As the Federal Circuit has made clear: "[k]nowledge of the reference and knowledge of materiality alone are insufficient after Therasense to show an intent to deceive."  1st Media, LLC v. Elec. Arts, Inc., 694 F.3d 1367, 1374 (Fed. Cir. 2012).

Here, as Plaintiff notes, the undisclosed prior art references were first cited in a related application on a different, non-identical claim.  Thus, there is a question as to whether the prior art was material.  Assuming it was material, the fact that the three prior art references were omitted in the prosecution of the '852 Patent is not enough, by itself, to establish specific intent to deceive.  While the facts allow for an inference that King or patent prosecution counsel George Metzenthin had some incentive to deliberately omit the references in the prosecution of the '852 Patent, that is by no means the only inference.  Metzenthin, in opposing the summary judgment motion, submitted a declaration stating that he had responsibility for the prosecution of several patent applications owned by the Army, including the '891 Application for an IV Training

26 - OPINION & ORDER

System, and the '665 Application which became the '852 Patent.  Metzenthin Decl. ¶ 2; ECF 128.

He reviewed the records of the application file history for the '665 Application and the '891

Application and recalls being involved in the prosecutions of both applications.  Id. ¶¶ 3, 4.  He

states that before Defendant's allegations of inequitable conduct, he was unaware of references in

the '891 Application that were not cited in the '665 Application.  Id. ¶ 6.  He also states that the

failure to cite references from the '891 Application in connection with the '665 Application was

inadvertent and not intentional.  Id. ¶ 7.  Metzenthin's Declaration suggests negligence or even

gross negligence, but not a specific intent to deceive.  Given the multiple, reasonable inferences,

the inequitable conduct facts do not, considered alone or under the "totality of the circumstances"

establish exceptionality as required for a fee award under section 285.

Because this case does not "stand out" from other patent cases, it is not exceptional.  I

deny the motion for attorney's fees and non-taxable costs under section 285.

II.  Section 1927

Defendant seeks an award of attorney's fees and non-taxable costs against Plaintiff's

counsel under section 1927.  See 28 U.S.C. § 1927 ("[a]ny attorney . . . may be required by the

court to satisfy personally . . . ").  Based on the discussion above in connection with the section

285 fee request, I deny the request for fees and non-taxable costs under section 1927, whether I

consider the facts under a "bad faith" or "reckless" standard.  Plaintiff's attorneys' conduct was

not unreasonable, in bad faith, or reckless.

III.  Court's Inherent Power

In addition to fees and non-taxable expenses, Defendant also seeks $115,361.16 in expert

fees as a sanction under this Court's inherent powers.  A bad faith finding is required to support

27 - OPINION & ORDER

an award of sanctions under a court's inherent authority. For the reasons previously explained, the facts do not establish bad faith.

IV. Costs

Under Federal Rule of Civil Procedure 54, costs "should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). Rule 54 creates a presumption in favor of awarding costs to the prevailing party. E.g., Ass'n of Mexican–Am. Educators v. California, 231 F.3d 572, 592 (9th Cir. 2000). Costs taxable under Rule 54(d) "are limited to those set forth in 28 U.S.C. §§ 1920 and 1821[.]" Twentieth Century Fox Film Corp. v. Entm't Distrib., 429 F.3d 869, 885 (9th Cir. 2005). Here, Defendant seeks costs only under section 1920.

Defendant seeks $27,765.01 in its Bill of Costs. ECF 157. Plaintiff does not object to $175 in copying costs incurred for obtaining certified copies of seven patents related to the litigation. Bill of Costs Ex. 3; ECF 157-3. This is an allowable cost under section 1920(4).

A. Fees for Service

Defendant seeks $1,633.50 in fees for service of the summons and subpoenas. See 28 U.S.C. § 1920(1); Alflex Corp. v.. Underwriters Lab., Inc., 914 F.2d 175, 177 (9th Cir. 1990) (per curiam ) ("Now that the Marshal is no longer involved as often in the serving of summonses and subpoenas, the cost of private process servers should be taxable under 28 USC § 1920(1).").

Plaintiff objects to certain of these costs. The record shows that Defendant incurred service-related fees as follows: (1) service of subpoena for records on the Department of the Army at Fort Detrick, Maryland; (2) service of pleadings on opposing counsel; (3) service of deposition subpoena on Calkin; (4) service of deposition subpoena on King; (5) service of deposition subpoena on Simulaids; (6) service of subpoena on the Office of the Staff Judge

Advocate at Fort Sam Houston; (7) service of subpoena on the Office of the Staff Judge

Advocate at Fort Polk; (8) service of subpoena on the Department of the Army; (9) service of

subpoena on the Naval Air Warfare Center; (10) service of subpoena on the Office of the Staff

Judge Advocate at Fort Carson; and (11) service of subpoena on the General Counsel of the

Navy.  Bill of Costs Ex. 1; ECF 157-1.

Plaintiff objects to the cost for service of a deposition subpoena on Calkin because,

Plaintiff argues, service of such a subpoena on a party is unnecessary.  A simple notice of

deposition would have sufficed.  Although Calkin was not a party, he was Plaintiff's General

Manager.  Plaintiff argues that service of a subpoena on the party's employee was not necessary.

The "Federal Rules of Civil Procedure distinguish between parties and non-parties in

establishing available discovery devices."  Jules Jordan Video, Inc. v. 144942 Canada Inc., 617

F.3d 1146, 1158 (9th Cir. 2010).  As an example, the Ninth Circuit stated that "under Rule 30

any person's testimony may be taken by deposition.  If a person is a party, a simple notice of

deposition is sufficient to compel attendance, while a non-party's attendance can be compelled

only by subpoena."  Id.

While the law supports awarding the $90 cost to Defendant, I decline to do so.  See Ass'n

of Mexican–Am. Educators, 231 F.3d at 591 (Rule 54(d) "creates a presumption in favor of

awarding costs to a prevailing party, but vests in the district court discretion to refuse to award

costs.").  Although Calkin was not a party, Defendant knew that he was Plaintiff's General

Manager and knew that he had been involved in the patent issues even before litigation

commenced.  Given his position, Defendant's counsel, in the spirit of professional collegiality,

should have inquired of Plaintiff's counsel if Calkin would make himself available for deposition

29 - OPINION & ORDER

at a mutually agreeable time and place with a simple notice of deposition. If Plaintiff's counsel

rebuffed the opportunity to do so, Defendant would have been well within its rights to serve the

subpoena on Calkin and to seek reimbursement of that service cost here. Without any evidence

in the record suggesting that Defendant attempted to informally and collegially attempt to notice

Calkin's deposition, I exercise my discretion to not award the $90 sought for the service of the

deposition subpoena.

Next, Plaintiff objects to the multiple requested costs for service of subpoenas on various

military entities. Plaintiff argues that this was a "discovery fishing expedition," Pl.'s Objs. to Bill

of Costs at 4, which sought the same records from six different military addresses. In support,

Plaintiff relies on Lovett's Declaration who states that the subpoenas were for the production of

"essentially" the same documents and the costs could have been avoided "through a more

strategic and tailored discovery strategy." Lovett Jan. 8, 2016 Decl. ¶ 3. Plaintiff does not object

to the most expensive of these costs which was $200 for service of subpoenas on the Office of

the Staff Judge Advocate at Fort Polk.

According to Defendant, the prior art, the invention, and King the inventor, had ties to

several departments and branches in the military. For example, King conceived of the invention

while an instructor at the Fort Carson 91W School and had demonstrated the invention at Fort

Sam Houston. The Army facilitated the license of the invention to Plaintiff. A potentially

invalidating prior art device was used by the Department of the Navy and was mentioned in an

Army pamphlet. Defendant notes it did not send multiple document requests to the same

department or military branch but sent the subpoenas to distinct departments or branches, each of

which operate independently and are at separate physical locations.

30 - OPINION & ORDER

Defendant offers a sufficient explanation for an award for all of these service-related

costs. The record supports Defendant's position that several different branches of the military

potentially had relevant information. Given that an award of costs to the prevailing party is

presumed and because Plaintiff fails to explain what a "more strategic and tailored discovery

strategy" should have looked like, I award costs associated with the service of these document

subpoenas sought by Defendant.

B. Deposition Costs

Defendant seeks $25,956.51 for deposition expenses. 28 U.S.C. § 1920(2) (allowing fees

for "printed or electronically recorded transcripts necessarily obtained for use in the case").

Plaintiff objects to the costs of videorecording several depositions. Plaintiff argues that the

video-related costs are duplicative of stenographic court reporting and thus, the video-related

costs are unnecessary and should not be awarded under section 1920.

Generally, a deposition "may be recorded by audio, audio-visual, or stenographic means."

Fed. R. Civ. P. 30(b)(3)(A). The use of the disjunctive in listing the methods of recording

suggests that only one method of actually recording the deposition is contemplated. This is

further underscored by Rule 30(b)(3)(B) which provides that with prior notice to the deponent

and other parties, any party may designate another method to record the deponent's testimony in

addition to the method specified by the person taking the deposition. Fed. R. Civ. P. 30(b)(3)(B)

(further providing that the party designating "another method" "bears the expense of the

additional record or transcript unless the court orders otherwise").

Presently, while the Ninth Circuit does not appear to have ruled on the issue, several

Judges in this Court have denied a request for both stenographic and videographic deposition

31 - OPINION & ORDER

costs.  E.g., United States ex rel. Berglund v. The Boeing Co., No. 03:02-cv-00193-AC, 2012

WL 697140, at *3 (D. Or. Feb. 29, 2012) (rejecting costs for both stenographic and videographic

depositions without explanation for necessity of video deposition), adopted by J. Aiken (D. Or.

Mar. 6, 2008); Davico v. Glaxosmithkline Pharms., No. 03:05-cv-06052-TC, 2008 WL 624049,

at *2 (D. Or. Jan. 23, 2008) ("In short, if a party wishes to videotape a deposition that is not a

perpetuation deposition, it may certainly do so at its own expense, but this court is not going to

pass on what it views to be an unnecessary expense to the other party by awarding such in a bill

of costs"); McCallum v. Boise Cascade, LLC, No. 03:06-cv-01834-ST, 2008 WL 5111122, at *2

(D. Or. Nov. 28, 2008) (denying costs for videotaping plaintiff's deposition when no explanation

was offered in support of the requested cost).  In an Opinion issued in September 2015, I

followed this trend.  Kaufman v. Geico Indem. Co., No. 3:13-cv-01932-HZ, 2015 WL 5167248,

at *5 (D. Or. Sept. 3, 2015) (rejecting cost of viderecorded deposition because the Court was

"unable to see why a written deposition transcript would not have sufficed").

      Defendant argues that several of the deponents of videorecorded depositions in this case

"possess a unique set of personal knowledge relevant to the parties' claims and defenses in this

case" and that a video copy of the deposition is a legitimate, independent form of the witness's

testimony.  Def.'s Reply to Pl.'s Objs. to Bill of Costs at 1-2.  Defendant suggests first that there

is always the risk a deponent will be unavailable to testify at trial.  Second, Defendant contends

the video form still "serves a unique purpose" because "[c]ommon sense teaches that video

excerpts, as opposed to reading from a written transcript, have a better chance of capturing the

jury's attention" and thus "creating a more powerful and memorable effect."  Id. at 2.

      These reasons are insufficient because they are not tied to why a video deposition was

required in addition to a stenographically transcribed deposition *in this case and for these witnesses*. Defendant's justifications are present in every case and provide no basis for distinguishing the video costs in this case from any other case. See Hunt v. City of Portland, No. 03:08-cv-00802-AC, 2011 WL 3555772, at *7 (D. Or. Aug. 11, 2011) (noting that "[r]outinely allowing recovery of the cost incurred for both the court reporter's transcript and a separate videographic record of depositions duplicates deposition costs without purpose.") (internal quotation marks omitted).

Plaintiff states that the video-related costs amount to $4,871. Pl.'s Objs. to Bill of Costs at 2 (highlighting the following costs for videography: (1) $1,205 for King and Calkin; (2) $1,172.50 for Kingsland, King, and Calkin; (3) $543.50 for Guentzler; (4) $1,950 for Stevick). But, Plaintiff appears to have overlooked video-related costs for the deposition of John McNeff on November 20, 2014. Bill of Costs Ex. 2 at 6-7. Confusingly, Defendant submits two invoices of differing amounts for the videotaped deposition of John McNeff. Id. Because Defendant seeks only the total amount of the first invoice, $3,876, I ignore the second invoice. The first invoice shows that of the $3,876 charged, $2,069 was related to videorecording the deposition. Id. at 6 (costs of $144, $450, $250, and $1,225). Thus, in addition to deducting the $4,871 for the videorecording of the depositions noted above, I also deduct the $2,069 for videorecording McNeff's deposition.

Next, Plaintiff objects to two items related to the cancelled deposition of Plaintiff's expert Dr. Glen Stevick. Both costs were incurred because Stevick's deposition was cancelled late. Id. at 15-16. Plaintiff argues that Defendant's late production of supplemental expert reports from Defendant's expert Dr. William Guenztler, which were served only the afternoon before Dr.

Stevick's deposition, forced Plaintiff to cancel Dr. Stevick's deposition. According to Plaintiff, the new reports included new and previously undisclosed legal issues, testing data, and expert conclusions. Plaintiff argues that there was insufficient time for Plaintiff and Dr. Stevick to review the new materials and prepare for the next morning's deposition.

Defendant argues that Plaintiff's actions in cancelling the deposition were unreasonable. I disagree. While Defendant states now that it would not have asked Dr. Stevick questions about anything in Dr. Guentzler's supplemental reports, Plaintiff was entitled to have its expert review the supplemental reports to fully comprehend Dr. Guenztler's comprehensive opinion before being deposed at all. Defendant's late submission of the supplemental reports caused the problem and Plaintiff should not bear the cost for that. Thus, I deduct $570 for the costs associated with the July 14, 2015 cancelled deposition of Dr. Stevick ($225 appearance fee; $345 videography fee).[5]

Finally, Plaintiff objects to the requested cost of fifty-percent of the transcript for the summary judgment oral argument. Plaintiff argues that because Defendant won at summary judgment, obtaining the transcript was not used in the case. I agree with Defendant that the appropriate inquiry is whether the transcript was reasonably necessary for Defendant at the time it ordered it. The summary judgment oral argument was November 10, 2015. Under the controlling Jury Trial Management Order, as amended by a later Order dated March 23, 2015, the first wave of pretrial documents was due four weeks before the February 8, 2016 pretrial conference, or January 11, 2016. ECF 31, 32, 66. Given that the parties did not know when the

---

[5] The videography fee of $345 is separately deductible for the reasons explained in the preceding section.

summary judgment decision would be filed or, obviously, what it would be, it was reasonable for Defendant to assume that it would have very little time between the decision and the preparation of its pretrial submissions.  Thus, it was not unreasonable to order the hearing transcript at the time of the argument rather than waiting for the summary judgment decision to be filed.  Thus, I do not deduct the $461.80 (representing Defendant's fifty-percent share) from the amount sought.

As to the deposition and transcript costs, I deduct a total of $7,510.

In summary on the Bill of Costs, I deduct the following from the $27,765.01 requested amount: (1) $90 for the deposition subpoena to Calkin; (2) $6,940 for duplicative videography of depositions; and (3) $570 for the cancelled Dr. Stevick deposition.  Defendant is awarded $20,165.01 in costs.

CONCLUSION

Defendant's motion for attorney's fees, non-taxable costs, and expert fees [158] is denied. Defendant's Bill of Costs [157] is granted in part and denied in part.  Defendant is awarded $20,165.01 in costs.

IT IS SO ORDERED.

Dated this _____ day of _____, 2016

Marco A. Hernandez
United States District Judge

35 - OPINION & ORDER